IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 5, 2010

## STATE OF TENNESSEE  v. WILLIE PRICE

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 05-08423, 05-08424      Chris Craft, Judge**

---

**No. W2009-00083-CCA-R3-CD  - Filed February 3, 2010**

---

The defendant, Willie Price, was convicted by a Shelby County jury of aggravated rape, a Class A felony, two counts of aggravated burglary, a Class C felony, and robbery, a Class C felony, and was sentenced by the trial court as a Range II offender to an effective sentence of sixty years in the Department of Correction.  On appeal, he challenges the sufficiency of the convicting evidence and argues that the trial court erred by ruling that the State could impeach his testimony with his prior burglary and theft convictions, consolidating his indictments for trial, admitting his statements to police, and enhancing his sentences and ordering that they be served consecutively.  Having reviewed the record and found no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which J.C. MCLIN and CAMILLE R. MCMULLEN, JJ., joined.

William D. Massey and Lorna S. McClusky, Memphis, Tennessee (on appeal); Trent Hall and Tim Albers, Assistant Public Defenders (at trial), for the appellant, Willie Price.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; William L. Gibbons, District Attorney General; and Alanda Dwyer and Nicole Germaine, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTS

This case involves a man who became known in the Memphis-area media as the "Hacks Cross Creeper."  On February 11, 2003, a man broke into the Germantown home of

the victim, D.W.,[1] robbed her, extracted her promise that she would not call the police, and then left through the back door. Despite her promise, the victim called the police as soon as her husband returned home. Less than a month later, on March 8, 2003, the same man broke into the victim's home again, awakened her from sleep, accused her of lying to him by calling the police, demanded more money, and raped her. The victim fought against the attack and the man bit her arm during the struggle. Approximately two and a half years later, investigators matched the DNA profile of saliva obtained from the victim's wound to the defendant.

Following his arrest, the defendant gave a statement to police in which he admitted that he had twice burglarized the victim's home and robbed her. He also admitted that he had penetrated the victim's vagina with his penis, but he claimed that the sexual contact had been consensual. He was subsequently charged in indictment number 05-08423 with aggravated rape, aggravated burglary, and three counts of criminal attempt to commit aggravated burglary, and in indictment number 05-08424 with aggravated burglary and robbery. At the State's request, the aggravated rape and aggravated burglary charges in case number 05-08423 were consolidated for trial with the aggravated burglary and robbery charges in case number 05-08424. The trial court granted the defendant's request to sever the three attempted aggravated burglary counts in case number 05-08423, which involved other homes in the victim's neighborhood, and those counts were later nolle prosequied by the State.

### Suppression Hearing

On November 31, 2006, the defendant filed a motion to suppress his statement to police. Although only the first and last pages of the motion are included in the record, we glean from the suppression hearing testimony that the defendant alleged the statement was involuntary due to promises of leniency made by the interviewing officers. At the suppression hearing, Detective William Stemmler of the Germantown Police Department testified that the defendant was taken into custody in Marshall County, Mississippi, where he read him his Miranda rights and the defendant requested a lawyer. He said that the defendant was taken before a court the next morning, waived his extradition rights, and was then transported to the Germantown Police Department by himself and Detective Fisher. He testified that he and Detective Fisher did not ask the defendant any questions or discuss the facts of the case, but the defendant told them at some point during the trip that he wanted to talk to them about the crimes. In response, they told him that they would talk once they reached headquarters.

---

[1] It is the policy of this court to identify victims of sexual assault by their initials only.

Detective Stemmler testified that when they arrived at the police department he contacted the city prosecutor, who advised him to read the defendant his Miranda rights again and gave him a list of questions to ask before questioning him. Detective Stemmler identified the defendant's waiver of rights form and the tape-recorded statement, which were admitted as exhibits to the hearing. He agreed that the recording reflected that he asked the defendant the reason for his change of heart about waiving his rights and whether he understood that his statement could be used against him in court. He denied that he made any promises of leniency to the defendant and said that the defendant never requested a lawyer and never told him that he wanted to stop talking to him.

The defendant testified that he waived extradition because a man whom he assumed was Detective Stemmler's supervisor assured him that, if he did not cooperate, "things [were] going to . . . happen . . . the way that he wanted them to." He said that he made the statement because the officers promised him during the trip to Germantown that he would receive a lower bond. On cross-examination, the defendant acknowledged that he had been involved with the criminal justice system for over ten years and knew that he had the right to a lawyer.

At the conclusion of the hearing, the trial court denied the motion to suppress, finding that the officers made no promises of leniency and that the statement was knowing and voluntary. The defendant proceeded to trial on the charges in January 2007.

## Trial

Lieutenant Colleen Hutson of the Germantown Police Department, the records custodian for 9-1-1 calls, identified the victim's 9-1-1- call made on March 8, 2003 at 1:25 a.m., which was admitted as an exhibit and published to the jury.

The victim testified that on the night of February 11, 2003, her husband was at work while she was at home with her four-month-old daughter and her parents, who were visiting from China. She said that she and her parents were upstairs watching television when she heard a noise downstairs, which she initially assumed was the sound of her husband returning home from work. Hearing no response when she called out to her husband, she looked downstairs, saw the patio door open, and started down to close it. The victim testified that, when she reached the bottom of the staircase, an African-American man threw her on the floor. She said that she screamed and her parents came to the top of the staircase as the man said, "It's cool, it's cool, I just want money."

The victim testified that her mother put $50 in an envelope and gave it to her father, who brought it downstairs and gave it to her. She, in turn, gave the envelope with money to the man. The victim explained that she gave the man the money because she was very

frightened, testifying that he told her he had a knife and an accomplice outside the door. She said that before fleeing out the back door the man asked her not to call the police, and she said "okay." However, as soon as her husband arrived home, she called the police.

The victim testified that on the night of March 7-8, 2003, she went to bed alone in her downstairs bedroom while her parents and her husband, who had offered to take care of the baby for the night, slept upstairs. She said she was asleep in her bra and underpants when she was awakened by someone touching her. She then heard a voice say,"[Y]ou lied to me and you called [the] police." At that point, she immediately recognized the intruder as the man who had broken into her home on February 11. The victim testified that the man covered her mouth with his hand and said, "I need money. And I need big money." She said she told him "okay," got up from bed to get the money, and screamed twice in an unsuccessful attempt to wake her sleeping parents and husband. In response, the man covered her mouth with his hand again, pushed her onto the floor, and held his other hand around her neck. He then pulled off her underwear and put his finger inside her private part. Next, he pulled his pants part of the way down, pulled out his penis, and put his penis inside her private part.

The victim testified that she struggled with the man but found it increasingly difficult to breathe because of the hand he held around her neck. Believing she was about to die, she finally told the man that she would stop struggling and that he could do what he wanted to her. At that point, the man released his hand from around her neck and got up to pull his pants off. As he did so, she got up, ran into the hall, pulled the door shut behind her, and screamed repeatedly for her husband while at the same time trying to keep the man confined in her bedroom. The man, however, pulled the door open and fled the house, jumping through an open window that led into the backyard.

The victim testified that she immediately telephoned the police, who responded to the scene very quickly. She stated that she was taken to a hospital after she told the police officers that she was having trouble breathing and that she went later that night to the Memphis Sexual Assault Resource Center for an examination. The victim identified photographs of the various injuries she sustained during the attack, which included a bite mark on her upper arm where the man bit her during the struggle, red marks on her neck, and carpet burns on her arm, elbows, knees, and buttocks.

The victim testified that the police showed her several sets of photographs of possible suspects, from which she eventually identified someone. She said the police later informed her that she had identified the wrong person.

The victim's husband testified that on the night of March 7-8, 2003, he was asleep in the baby's room upstairs when he was awakened sometime after midnight by his wife's

screams. When he got downstairs, he found his wife dialing 9-1-1 and a window open that had been closed when the family went to bed. He stated that his wife, who was extremely upset, told him that "the guy had come back again." He testified that he saw no one when he checked outside but that the side gate to the yard was open.

Officer Bruce Cannon of the Germantown Police Department, who responded to the February 11, 2003, burglary of the victim's home, testified that officers processed the scene for evidence but, to his knowledge, recovered nothing that led to the development of any suspect.

Detective Matt Fisher of the Germantown Police Department identified various crime scene photographs taken of the victim's home on March 8, 2003, including ones that showed dirt on the windowsill of the kitchen window through which the intruder had apparently gained entry to the home, a brown cloth glove intertwined in the sheets of the victim's bed, and a screwdriver and a pair of socks on the floor of the victim's bedroom.

Investigator Anthony Kemp of the Germantown Police Department identified the various items that were collected into evidence in connection with the case, including swabs from the bite mark on the victim's arm, which he transported to the Tennessee Bureau of Investigation ("TBI") for analysis.

Detective Michael Gray of the Germantown Police Department identified a buccal swab he collected from the defendant on October 6, 2005, which was subsequently submitted to the TBI for analysis.

TBI Special Agent Forensic Scientist Donna Nelson, an expert in serology and DNA, testified that she discovered the presence "of an unidentified male individual and also the presence of the victim on the swab [of the victim's bite mark]." She said that she ran the DNA of the unidentified male through the databases that were available to her at that time but did not obtain any results. At some point, however, she obtained a "reverse hit" based on new information that had been entered into the databases from another agency, relayed that information to the Germantown Police Department, and told them that she needed a standard from the defendant. After receiving the defendant's buccal swab, she determined that the defendant's DNA profile matched that of the unidentified male's DNA, with the probability of an unrelated individual having the same DNA profile exceeding the world population.

Detective Stemmler testified that he interviewed a number of individuals in connection with the case and eventually obtained DNA samples from nineteen different subjects. He stated that the victim identified one man from the numerous photospreads he

showed her during the course of his investigation but that individual's DNA was not a match to the sample. He did not show the victim any more photospreads after her misidentification and the defendant's photograph was not included in any of the photospreads she viewed.

Detective Stemmler testified that he obtained an arrest warrant for the defendant after Agent Nelson informed him that his name had come up as a match to the unknown male's DNA. He described the defendant's arrest and transport to Germantown and identified his waiver of rights form and tape-recorded statement, which were admitted as exhibits and published to the jury. He said that the defendant was initially charged with two counts of aggravated rape based on the victim's account of the defendant's having penetrated her with both his finger and his penis.

Officer Jack Antonuk of the Germantown Police Department testified that he was taking the defendant to jail following his arraignment when the defendant told him that he needed to talk to Detective Stemmler because he was confused about the charges. He said he asked the defendant the source of his confusion, and the defendant explained that it was due to the fact that he had been charged with burglary and two counts of rape. Officer Antonuk testified that the defendant continued by telling him that he had committed the burglary but had only raped the victim once, stating that he had stuck his penis inside the victim but not his finger. On cross and redirect examination, Officer Antonuk conceded that the defendant did not use the word "rape" but instead said,"I did it once."

Carolyn Chambers, employed by the Shelby County Sheriff's Department to record and monitor telephone conversations in the jail, identified a CD containing a telephone conversation between the defendant and his sister, which was subsequently admitted as an exhibit and played for the jury. In the conversation, the defendant admitted that he had twice broken into the victim's house but denied that he had raped her. Instead, the defendant claimed to his sister, as he had to the police, that the victim made sexual advances toward him as he was trying to leave the house.

Margaret Aiken, the nurse clinician who examined the victim on March 8, 2003, testified that the victim had a red mark on her neck, a human bite mark on her arm, a bruise on her right thigh, redness and lacerations on her back, and an abrasion on her elbow. In addition, the victim had redness, tenderness, and a laceration in the posterior fourchette region of her vagina, which, according to Nurse Aiken, is a common area for a laceration to occur in cases of forced sexual intercourse. She testified that the injuries to the victim's vagina were consistent with penetration and more consistent with penile penetration than digital penetration. She agreed that the injuries were also consistent with the victim's account of what had transpired, which was that she was awakened by a black male who had invaded her home approximately one month earlier, that the man held a screwdriver, and that he forced vaginal sex with her.

-6-

The defendant elected not to testify and presented no witnesses in his defense.

The State elected the incident of penile penetration with respect to the aggravated rape count of the indictment, and, following deliberations, the jury convicted the defendant of aggravated rape and aggravated burglary as charged in indictment number 05-08423 and aggravated burglary and robbery as charged in indictment number 05-08424.

## Sentencing Hearing

At the February 23, 2007, sentencing hearing, the State introduced the defendant's presentence report and certified copies of judgments showing that he had two 1996 convictions for attempted aggravated robbery, and a 2004 conviction for aggravated burglary.

Detective Jimmy Pardue of the Collierville Police Department testified that he interviewed the defendant, who was suspected in approximately twenty-five to thirty Collierville burglaries, following his arrest in the Germantown cases. He said that the defendant did not make any specific admissions in the Collierville cases but, at one point, said that he had committed so many burglaries around the area that "he didn't know where they were." He stated that the defendant told him he had started burglarizing for the money, but it later "turned into basically just kind of the thrill of doing it." In addition, the defendant told him that while the police were investigating the Germantown burglary and rape, he was "across the street in the shadows watching the show."

Detective Pardue further testified that in one of the Collierville burglaries the perpetrator awakened the daughter of the house, tried to put his hand under her covers, made comments about wanting to have sex with her, and fled when the young woman screamed. He said that a sock and a screwdriver were found outside the house and that the victim in that case later identified the defendant as the perpetrator from a photographic spreadsheet.

The defendant's sister, Willette Blayde, testified that the defendant was a high school graduate and the father of a son. She described him as a "nice, quiet guy" with a strong religious faith and said that he had, to her knowledge, always been employed. She stated that she and her family, which included her mother and her sister, both of whom were present in the courtroom in support of the defendant, believed in the defendant's innocence and stood behind him. On cross-examination, she acknowledged that the defendant admitted to her in the recorded telephone conversation that he had broken into the victim's home, and she later clarified that she and her family continued to believe that the defendant was innocent of the rape charge.

At the conclusion of the hearing, the trial court found that the defendant was a Range II offender based on his two prior Class C felonies of attempted aggravated robbery. The

court found one enhancement factor applicable – that the defendant had a previous history of criminal convictions in addition to those necessary to establish his range – based on the defendant's Class C felony of aggravated burglary and his prior misdemeanor conviction for theft. The trial court specifically stated that it was not considering any of the defendant's numerous pending charges or the testimony of Detective Pardue about the Collierville burglary in applying this enhancement factor. Finding no applicable mitigating factors and applying great weight to the enhancement factor of the defendant's prior criminal convictions, the trial court sentenced the defendant as a Range II offender to thirty-six years for the Class A felony of aggravated rape, three and a half years above the midpoint in the range. The trial court sentenced the defendant to eight years for the robbery conviction and for each of the aggravated burglary convictions, two years above the minimum sentence for a Range II offender convicted of a Class C felony. Finally, finding the defendant to be a dangerous offender, the trial court ordered that all four sentences be served consecutively, for an effective sentence of sixty years in the Department of Correction.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant first contends that the evidence was insufficient to sustain his convictions. Specifically, he argues that the State failed to establish beyond a reasonable doubt his identity as the perpetrator of the crimes. In support, he points out that the victim not only failed to identify him as her attacker but in fact identified someone else as the perpetrator. He characterizes the DNA evidence as "tenuous," asserting that "the record is very unclear as to how the [d]efendant was developed as a possible suspect and how the DNA evidence was obtained" and that because the search warrant is not included in the record, "it is . . . impossible to say . . . if the arrest and search of the [d]efendant were valid." The State argues that the defendant's identity was sufficiently established by the proof at trial, which included the DNA evidence linking the defendant to the crimes as well as the defendant's statements of admission to the police. We agree with the State.

When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754

S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

We conclude that the evidence, viewed in the light most favorable to the State, was more than sufficient to establish the defendant's identity as the perpetrator of the crimes. The victim testified that she immediately recognized the man who awakened her on the night of March 7-8, 2003, as the same man who had broken into her home and robbed her on February 11. The perpetrator bit the victim's arm during the rape, and the DNA profile obtained from saliva in the bite wound was later conclusively matched to the defendant's DNA. According to TBI Special Agent Nelson, the probability of an unrelated individual having the same DNA profile exceeded the current population of the world. In light of this scientific evidence, the fact that the victim identified someone else from the various photospreads she was shown, none of which included the defendant's photograph, carries very little weight. Moreover, the defendant also gave statements to police in which he admitted that he was the man who broke into the victim's home, robbed her, and penetrated her vagina with his penis.

As for the defendant's complaints regarding the DNA evidence, we note that the defendant apparently raised no challenge to the validity of the arrest or search warrants in the trial court, raising the issue for the first time only in a footnote in his appellate brief. Furthermore, we respectfully disagree with his assertion that the record is unclear as to how he was developed as a suspect and how his DNA was obtained. TBI Agent Nelson explained that new information was continually being added to the databases and that the unknown male's DNA resulted in a "reverse hit" at some time after her initial testing based on new information that had been added by another agency. Detective Stemmler, in turn, explained

that he obtained an arrest warrant for the defendant based on the information supplied by Agent Nelson. In sum, abundant proof was presented by which the jury could find the defendant guilty of the crimes beyond a reasonable doubt. We conclude, therefore, that the evidence was sufficient to sustain the defendant's convictions.

## II. Admissibility of Prior Convictions for Impeachment Purposes

The defendant next contends that the trial court erred by ruling that the State could impeach his testimony with his prior aggravated burglary, attempted aggravated robbery, and theft convictions. He argues that the probative value of those convictions was far outweighed by their prejudicial effect because they were "either identical or remarkably similar to the charged offenses." He further argues that the trial court failed to make adequate findings on the record in support of its ruling. The State argues, alternatively, that the trial court did not abuse its discretion in ruling that the convictions would be admissible to impeach the defendant's credibility and that any error in the court's ruling was harmless in light of the substantial evidence against the defendant.

A conviction may be used to impeach the testimony of an accused in a criminal prosecution if the following four conditions are satisfied: (1) the conviction is for a crime punishable by death or imprisonment in excess of one year, or the conviction is for a misdemeanor which involved dishonesty or false statement; (2) less than ten years has elapsed between the date the accused was released from confinement and the commencement of the subject prosecution; (3) the State gives reasonable pretrial written notice of the particular conviction or convictions it intends to use as impeachment; and (4) the trial court concludes that the probative value of the prior conviction on the issue of credibility outweighs its unfair prejudicial effect on the substantive issues. Tenn. R. Evid. 609; State v. Mixon, 983 S.W.2d 661, 674 (Tenn. 1999).

Two factors should be considered when deciding whether the probative value of a prior conviction outweighs its unfair prejudicial effect. Mixon, 983 S.W.2d at 674. First, "[a] trial court should . . . analyze the relevance the impeaching conviction has to the issue of credibility." Id. (citation omitted). Second, if the trial court finds that the prior conviction is probative of the defendant's credibility, then the court should "'assess the similarity between the crime on trial and the crime underlying the impeaching conviction.'" Id. (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 609.9 at 376 (3d ed. 1995)). The more similar the impeaching conviction is to the offense for which the defendant is on trial, the greater the risk of a prejudicial effect to the defendant. Id.

A trial court should make findings on the record when deciding whether to admit a prior conviction for the purposes of impeachment:

Tennessee case authority strongly urges judges to explicitly state, on the record, their reasons for allowing or disallowing a criminal conviction to be used for impeachment under Rule 609. The trial court should carefully explain any balancing of factors. Without this record, it will be difficult for appellate courts to determine whether the balancing test was properly applied.

Neil P. Cohen et al., Tennessee Law of Evidence § 6.09[14][b] (5th ed. 2005) (footnotes omitted).

This court reviews a trial court's ruling on the admissibility of prior convictions for impeachment purposes under an abuse of discretion standard. See State v. Waller, 118 S.W.3d 368, 371 (Tenn. 2003).

In its ruling, the trial court recognized that the convictions were the same or similar to the offenses at trial but found that they would be "extremely probative of [the defendant's] credibility" because they were "crimes involving dishonesty." The court commented that if the convictions were admitted, it would issue the proper curative instruction to the jury regarding their use. We cannot conclude that the court's ruling constituted an abuse of discretion. As the defendant himself concedes in his brief, robbery, burglary, and theft are all offenses involving dishonesty and, as such, are highly probative of credibility. See State v. Welcome, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007); State v. Blevins, 968 S.W.2d 888, 893 (Tenn. Crim. App. 1997); State v. Baker, 956 S.W.2d 8, 15 (Tenn. Crim. App. 1997); State v. Tune, 872 S.W.2d 922, 927 (Tenn. Crim. App. 1993). Moreover, "the fact that a prior conviction involves a similar crime for which the defendant is being tried does not automatically require its exclusion." Blevins, 968 S.W.2d at 893. The defendant's credibility would have obviously been a central issue had he taken the stand in his own defense, given his claim in his statement to police that the victim had engaged in consensual intercourse with him. Therefore, under the circumstances of this case, we conclude that the trial court properly ruled that the probative value of the convictions on the issue of the defendant's credibility outweighed their prejudicial effect.

### III. Consolidation of Indictments

The defendant next contends that the trial court erred by granting the State's motion to consolidate his indictments for trial, arguing that the trial court erred in concluding that the second incident constituted part of a continuing plan or conspiracy. He asserts that "[w]hile the burglaries may have been part of a continuing plan, it is clear that the Aggravated Rape was not part of that plan[,] and that proof of the aggravated rape was extremely prejudicial to the aggravated burglary and robbery cases. The State argues that the cases were properly consolidated due to their commonality of victim, defendant, and modus.

Tennessee Rule of Criminal Procedure 8(b) provides:

> Permissive Joinder of Offenses.--Two or more offenses may be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13, if:
>
> (1) the offenses constitute parts of a common scheme or plan; or
>
> (2) they are of the same or similar character.

Tennessee Rule of Criminal Procedure 14(b) provides in part:

> Severance of Offenses.
>
> (1) Involving Permissive Joinder of Offenses.--If two or more offenses are joined or consolidated for trial pursuant to Rule 8(b), the defendant has the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others.

"Decisions concerning consolidation and severance of offenses pursuant to [Tennessee] Rules of Criminal Procedure 8(b), 13 and 14(b)(1) will be reviewed for an abuse of discretion." State v. Denton, 149 S.W.3d 1, 12 (Tenn. 2004) (citations omitted). "An abuse of discretion in this context implies that the trial court applied an incorrect legal standard or reached a decision against logic or reasoning which caused an injustice to the complaining party." Id.

There are three categories of common scheme or plan evidence: (1) offenses that reveal a distinctive design or are so similar as to be considered "signature crimes"; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction. State v. Shirley, 6 S.W.3d 243, 248 (Tenn. 1999) (citing Neil P. Cohen et al., Tennessee Law of Evidence § 404.11, at 180 (3d ed. 1995)). In this case, the trial court found that the offenses were part of a continuing plan or conspiracy and that evidence of each episode would be admissible at the trial of the other. The trial court's ruling states in pertinent part:

> It's not a signature crime. So whether or not it's . . . a continuing plan to go back and rob the same place again which is his statement to the police. Also we've got to consider whether or not the proof of the second crime would be admissible in the proof of the first crime, whether or not the proof in the first crime would be admissible in the second crime. I think if I tried the first burglary and [the victim] could not identify him in court or could identify him

in court and the Defense argued that her identification was unreliable, I think the State would have a right to get in the DNA evidence from the second burglary and the statement which wouldn't be allowed in the first one if . . . they were severed . . . .

If we tried the second burglary by itself, I think the State would be allowed to get in the proof of the first burglary to improve her in court ID if she were able to identify him and also to show the reason why he had a motive to go back in is because he'd been there before and that he was in there for money, not to use the bathroom or because he was intoxicated. There's no question in my mind that the second offense was connected to the first offense and that he went back in there because he'd been in there before and he found that she was a foreign person, as he said it, and that they had money.

We find no abuse of discretion in the trial court's ruling. In his statement to police, the defendant said that he went back to the victim's house a second time because he thought that, being foreign, the family probably had money. The victim immediately recognized the defendant as the same man who had burglarized her house earlier, and the DNA evidence he left behind in the second burglary and rape was what led to his eventual arrest and identification. Furthermore, the rape, which the defendant contends was so prejudicial to his case, was inextricably tied with the second burglary. We conclude, therefore, that the trial court properly granted the State's motion to consolidate the cases for trial.

## IV. Denial of Motions to Suppress/Exclude Statements

The defendant next contends that the trial court erred in denying both his pretrial motion to suppress his formal statement to police and his motion in limine to exclude his post-arraignment statement to Officer Antonuk. He argues that his formal statement was rendered involuntary, in violation of his rights under the Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution, due to the promises of leniency given to him by the interviewing officers. He further argues that his statement to Officer Antonuk violated both his Fifth and Sixth Amendment rights to counsel because Officer Antonuk, who either knew or should have known that he had previously requested counsel, encouraged him to talk by asking why he was confused about the charges.

When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith,

978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)).

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The corresponding provision of the Tennessee Constitution states "[t]hat in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Thus, to be admissible at trial, a confession made while under custodial interrogation must be shown to have been freely and voluntarily given, after the defendant's knowing waiver of his constitutional right to remain silent and to have an attorney present during questioning. See Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966).

Under the Fifth Amendment, a confession is involuntary when it is the result of coercive action on the part of the State. Colorado v. Connelly, 479 U.S. 157, 163-64, 107 S. Ct. 515, 520 (1986). Our supreme court has concluded that "the test of voluntariness for confessions under Article 1, § 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992). In order for a confession to be considered voluntary in Tennessee, it must not be the result of "'any sort of threats or violence, . . . any direct or implied promises, however slight, nor by the exertion of any improper influence.'" State v. Smith, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (quoting Bram v. United States, 168 U.S. 532, 542-43, 18 S. Ct. 183, 187 (1897)). Courts look to the totality of the circumstances to determine whether a confession is voluntary. State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996).

In denying the defendant's motion to suppress his formal statement to police, the trial court specifically accredited the testimony of Detective Stemmler over that of the defendant, finding that the officers made no promises of leniency, the defendant was repeatedly informed of his rights, and that the statement was knowing and voluntary. The trial court's ruling states in pertinent part:

> I believe the detective's testimony when he says even when [the defendant] wanted to talk to him (indiscernible) they didn't talk to him. They waited until he could talk to the . . . Germantown prosecutor. . . . And they just go over and over his rights with him on the tape and explain it further and . . . ask him about his rights getting a lawyer. Are you sure, you know. And so it's clear to me that [the defendant] gave up these rights after being informed of them and gave this statement freely and voluntarily to the police. There was

-14-

nothing overbearing about -- as far as [the defendant] talking about promises they didn't come through with or something like that, I just cannot find [the defendant's] testimony either credible or compelling.

The record fully supports the findings and conclusions of the trial court. The recorded interview reflects that the defendant repeatedly assured the officers that he wanted to waive his rights and give a statement. Furthermore, according to Detective Stemmler's testimony, which was accredited by the trial court, the defendant initiated the conversation and neither officer made any promises to induce him to talk. Accordingly, we conclude that the trial court properly denied the defendant's motion to suppress his statement to police.

The defendant also contends that the trial court erred by not excluding Officer Antonuk's testimony, arguing that his admissions to Officer Antonuk should have been suppressed because they were made after he had requested counsel and expressed his desire not to speak to law enforcement officers. At trial, however, defense counsel argued only that the statement should be excluded because it was unfairly prejudicial to the defendant and not probative of the issues at trial. "It is well-settled that an appellant is bound by the evidentiary theory set forth at trial, and may not change theories on appeal." State v. Alder, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001) (citing State v. Banes, 874 S.W.2d 73, 82 (Tenn. Crim. App. 1993)). We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. See State v. McLeod, 937 S.W.2d 867, 871 (Tenn. 1996).

After being informed of the substance of the proposed testimony, the trial court denied the motion, ruling in pertinent part:

Well, under 403 the test is not whether or not it's prejudicial, otherwise no confession or any evidence would be admitted against the defendant because it's prejudicial. The question [is] whether or not it's unfairly prejudicial. If in this case there were another sexual assault that had been severed and not on trial or for some reason we'd be getting to the jury something that would be unfair to the defendant because it had been severed, that would be one thing. But under the circumstances, although it is extremely prejudicial, it's not unfairly so, fairly so. And because there is no unfair prejudice and it's probative of the defendant's consciousness of guilt, I guess the [S]tate would theorize. Because of that I don't see that it's excludable, [defense counsel], so I'm going to allow it.

We find no abuse of discretion in the trial court's ruling. The trial court properly found that the evidence was highly probative to the issues at trial and that it was not unfairly prejudicial to the defendant. We conclude, therefore, that the defendant is not entitled to relief on the basis of this claim.

## V. Sentencing

Lastly, the defendant contends that the trial court erred by enhancing his sentences and ordering that they be served consecutively. The State argues, *inter alia*, that the trial court's use of the defendant's prior criminal convictions to enhance his sentences was proper and that the record supports the trial court's finding that the defendant was a dangerous offender. We agree with the State.

The defendant first argues that the trial court engaged in impermissible fact-finding in violation of his Sixth Amendment rights by enhancing his aggravated rape sentence to seventeen years beyond the minimum in the range. As an initial matter, we note that the defendant was sentenced under the old law, which required the trial court to start at the midpoint in the range for a Class A felony, because the offenses were committed in 2003 and the defendant chose not to execute a waiver of his *ex post facto* rights. Thus, the trial court did not enhance the rape sentence by seventeen years, as asserted by the defendant, but instead by only three-and-a half-years. Moreover, the trial court enhanced the sentences based solely on the defendant's prior criminal convictions. It is well-established under Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004), and its progeny that the use of prior criminal convictions to enhance a sentence does not violate a defendant's Sixth Amendment rights. We conclude, therefore, that the trial court properly applied the enhancement factor of the defendant's prior criminal convictions and that this enhancement factor justified the length of the sentences imposed in this case.

The defendant next argues that the trial court erroneously used his prior criminal history for both enhancement and consecutive sentencing purposes, in violation of the holding in State v. Glenn Pardue, No. 01C01-9302-CC-00048, 1993 WL 366548 (Tenn. Crim. App. Sept. 16, 1993), perm. to appeal denied, concurring in results only (Tenn. Apr. 4, 1994). He acknowledges that this court has repeatedly ruled adversely to his position, but nonetheless urges that "the reasoning of P[a]rdue should carry the day." We respectfully disagree. Pardue was an unpublished case in which our supreme court concurred in the results only. Furthermore, as the defendant acknowledges, we have repeatedly rejected similar claims, including in an opinion in which the defendant, as in this case, cited Pardue as authority for his position. In State v. Albert Hayes, No. 02C01-9408-CC-00182, 1995 WL 81427, at **1-2 (Tenn. Crim. App. Mar. 1, 1995), perm. to appeal denied (Tenn. May 30, 1995), we wrote:

> In Pardue, the trial court enhanced the defendant's sentence and ordered consecutive sentencing based on a finding that the defendant had no hesitation about committing crimes when the risk to human life was high. T.C.A. § 40-35-114(10) (Supp. 1994). The Pardue court said that "[w]ithout some factual distinction in support of each application, the duplicative utilization of

-16-

this consideration, in such quarters, is improper and not contemplated by the Sentencing Reform Act. In short, the trial court must provide the factual distinction to support the compounded use of this factor to enhance, as well as to impose consecutive sentencing. Otherwise, the trial court must use the factor to enhance or use it for consecutive sentencing." Pardue, 1993 WL 366548 at *4.

This Court, however, had previously stated in two reported decisions that prior felony convictions can be used both to increase the length of a sentence and to impose consecutive sentences. State v. Davis, 825 S.W.2d 109, 113 (Tenn. Crim. App. 1991); State v. Davis, 757 S.W.2d 11, 13 (Tenn. Crim. App. 1987). "Nothing in the 1989 Act prohibits consideration of prior criminal convictions and conduct for both enhancement and consecutive sentencing purposes as long as those sentences comply with the purposes and principles of the 1989 Act." Davis, 825 S.W.2d at 113.

We affirm the judgment of the trial court. First, the Davis cases are published opinions and thus are precedent; Pardue is not precedent. Further, the case at bar involves the same statutory enhancement factor as that in the Davis cases; Pardue does not. Lastly, we agree with the reasoning in the Davis cases that enhancing a sentence or sentences and running sentences consecutively based on a defendant's criminal history is consistent with the Criminal Sentencing Reform Act of 1989 ("Act") when the sentences comply with the purposes and principles of the Act.

Finally, the defendant argues that the trial court failed to make adequate findings of fact in support of its imposition of consecutive sentencing under the dangerous offender criterion of the statute. We, again, respectfully disagree.

Tennessee Code Annotated section 40-35-115(b) provides that it is within the trial court's discretion to impose consecutive sentencing if it finds by a preponderance of the evidence that any one of a number of criteria applies, including that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4) (2006). When a trial court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it is required to make further findings that the aggregate length of the defendant's sentence reasonably relates to the severity of his offenses and is necessary to protect the public from further criminal conduct of the defendant. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995).

In imposing consecutive sentencing, the trial court found that the defendant's actions in returning to the victim's home to punish her for having reported his first crime to the police, and the manner in which he did so, qualified him as a dangerous offender. The trial court further found that the defendant's sixty-year sentence reasonably related to the severity of his offenses and was necessary to protect the public from further criminal conduct of the defendant. The trial court's ruling states in pertinent part:

Looking at consecutive sentencing, I'm finding the following: That [the defendant] is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. . . .

. . . But I do find that what he did was he went into this lady's house and robbed her for money while all this other stuff was going on and he told her, the proof in the case was, not to go to the police or the authorities. And that just a few days later -- and I'm drawing this inference from the proof because all this was covered on TV while all of this was going on, everybody heard it -- he comes by just a few days later and says I told you not to call the police. In other words, he watched himself on TV, watched the reports of this case. And knowing all that he came back and confronted her with the fact that she called the authorities and he raped her, that the circumstances of these crimes that he repeated against this victim are extremely aggravated.

This crime is every homeowner's nightmare. I used to wonder as a prosecutor when I was trying burglary cases and as a defense lawyer when I was trying burglary cases why we could never find the victims because they'd all moved because their home had been violated and they moved. In this case he not only violated her home and burglarized and robbed her but he came back a second time. Under those circumstances, I mean, this is -- [the defendant] is the reason we build prisons in our state.

. . . .

But there's just no reason for him to have done what he's done. There is something wrong with [the defendant]. He's dangerous. And I have to find that the aggregate length of the sentence is reasonable as it relates to the offense for which he stands convicted. What do we do to someone who invades someone's home in a home invasion and then repeatedly repeats that act later to confront that person with the fact that they called the police with two prior attempted aggravated robberies and a prior burglary conviction?

-18-

And I find that a sentence of 60 years, which will be 36 years consecutive to eight years consecutive to eight years consecutive to eight years would be sufficient. I think it reasonably relates to what this man has done on preying on this lady in her home, not considering any of his other cases.

The record supports the trial court's imposition of consecutive sentencing. The defendant burglarized the victim's home, knocked her to the ground, robbed her by threatening her with a knife and an accomplice, and extracted her promise that she would not call the police. Less than a month later, the defendant returned to the victim's home to punish her for having reported his first crime to the police. In the process, the defendant choked the victim to the point that she feared she was going to die, demanded more money, and raped her. These actions, in our view, are sufficient to support the trial court's classification of the defendant as a dangerous offender. We conclude, therefore, that the trial court did not err in imposing consecutive sentences.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE